# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

SHERRON MASSALAY,

    **Petitioner,**

    v.

WARDEN, ROSS
CORRECTIONAL INSTITUTION,

    **Respondent.**

                **CASE NO. 2:17-CV-422**
                **JUDGE MICHAEL H. WATSON**
                **Magistrate Judge Kimberly A. Jolson**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the Petition (Doc. 3), Respondent's Answer / Return of Writ (Doc. 5), Petitioner's Reply (Doc. 8), and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that the Petition be **DENIED** and that this action be **DISMISSED**.

## I. FACTS AND PROCEDURAL HISTORY

The Court of Appeals for Ohio's Tenth District summarized the relevant facts and procedural history of this case as follows:

> . . . On January 28, 2015, [Petitioner] was indicted for two counts of felonious assault, pursuant to R.C. 2903.11, first-degree felonies under R.C. 2903.11(D)(1)(a), with associated firearm specifications pursuant to R.C. 2941.145(A) and 2941.1412(A). [Petitioner] pled not guilty to the charges, and the case proceeded to a four-day jury trial commencing March 30, 2015 . . . .
>
> Appellee produced the following relevant evidence in its case-in-chief.
>
> . . . Columbus Police Officer Paul Tobin testified that around 6:30 a.m. on January 6, 2014 he was dispatched to the area of Lockbourne Road and East Sycamore regarding a traffic-related disturbance. He arrived there in uniform and in a marked cruiser, and heard yelling and screaming coming from the front porch of 872 Lockbourne Road. Tobin parked his cruiser on the east side of Lockbourne Road

in front of the house, rolled down his passenger side window, and heard a man, who he identified in court as [Petitioner], saying "get the F away from my house, I don't want you in front of my house." (Tr. Vol. II, 141.) Tobin called the other cruiser in the area to come back to the scene, and as he hung up, heard something bounce off the front right quarter panel of his cruiser. At the time he did not know exactly what had been thrown at him, but realized "something hostile had happened." (Tr. Vol. II, 141.)

. . . According to Tobin, Officer Joseph Townsend arrived in another cruiser and parked "nose to nose" with him on the east side of Lockbourne Road in front of the house. (Tr. Vol. II, 141.) Townsend exited his cruiser and approached Tobin on the driver's side of Tobin's cruiser. Tobin and Townsend stood in the middle of the roadway, and Tobin told Townsend that somebody hit the side of his cruiser with something. Tobin testified that, at that point:

> [W]e were walking down the side of my cruiser, getting ready to go around to the rear end of it, I could hear a male from the front porch yell something like, you killed Tashon or Tayron [sic], you are a bunch of B's, bitches. And just as I come around the rear end of my cruiser, I am facing the front porch, a huge gunshot rang out, large muzzle blast, and I dove down behind the cruiser to seek cover. (Tr. Vol. II, 141–42.)

. . . Although he had a Kevlar vest on, Tobin testified that it would not protect him from a direct rifle shot. Tobin and Townsend crawled behind the engine block of Tobin's cruiser for safety, called for more officers to respond to the scene, and then raised up, guns drawn. [Petitioner] ran back inside the house, and Tobin again heard him yelling at them while pacing back and forth between the front door and a window. SWAT officers arrived shortly thereafter, and secured a rifle lying on the front porch. [Petitioner] opened the front door and yelled for officers to get off his porch. SWAT officers took [Petitioner] into custody.

. . . Tobin specified that [Petitioner] fired the rifle while standing on the front porch in between the front door and window, while officers were walking around the end of Tobin's cruiser "getting ready to approach the sidewalk leading up to the front of his house." (Tr. Vol. II, 156.) Tobin believed no one else was located within the vicinity, confirmed that he could tell [Petitioner] was looking at him, and could tell that [Petitioner] fired the gun at both him and Townsend:

> There wasn't a direction of muzzle blast that you could see. You could tell it wasn't pointed down in the road or up in the air or down on the ground. It totally filled all of my peripheral vision.
> * * *
> [T]he detective asked the same question, are you certain that he fired at you? Yes.
> * * *

2

> [O]n the other side of the road, almost directly behind where we were standing as we were getting ready to approach his front sidewalk, there is [a] small hillside above the sidewalk, and you could tell w[h]ere a round struck the ground and put a fairly large hole into the side of the hill. It looked like a small stick of dynamite had gone into the hill. That is where we believed the round had struck. (Tr. Vol. II, 147–48.)

. . . Tobin additionally confirmed his belief that [Petitioner] threw a "ten-inch kitchen knife or butcher knife" at him as he was in his cruiser. (Tr. Vol. II, 146.) Tobin did not actually see [Petitioner] throw the knife, but saw [Petitioner] pacing on the porch and yelling prior to the cruiser being struck by an object, saw [Petitioner] on the porch after the cruiser was struck, and discovered a large kitchen knife on the sidewalk just off the front right quarter panel of his cruiser.

On cross-examination and redirect, Tobin testified that the porch was approximately 25 feet from his cruiser, with a shrub blocking the cruiser depending on the perspective, and it was mostly dark when he arrived but street lights were on and [Petitioner] was backlit from the lights on inside the house. He confirmed that he heard only one shot, and specified the muzzle blast "filled all of my vision. All [he] could see was a muzzle blast." (Tr. Vol. II, 172.) At the time of the gunshot, Tobin testified that Townsend was "[e]ither beside me or directly behind me." (Tr. Vol. II, 186.) Tobin confirmed that, to fire multiple shots from a semiautomatic rifle, it must have a magazine, and that if you remove the magazine but a round remains in the chamber, that rifle could possibly still be a live weapon. Tobin agreed that he did not recover the bullet.

. . . Townsend testified that he was the first cruiser to arrive at Lockbourne Road, at around 6:30 a.m. on January 6, 2014, in response to the dispatch regarding a traffic-related disturbance. After trying to find people involved in the traffic incident, Townsend returned to Lockbourne Road, parked in front of Tobin's cruiser, and exited his cruiser to talk to him. He heard someone at the house in front of their cruisers yelling "I will kill you" and referencing "Tashon" or "Trayvon," and believed the individual was yelling at and confronting him and Tobin. (Tr. Vol. II, 201.)

. . . The officers approached the house to try and make contact. The officers were standing "basically directly next to each other" in the street behind Tobin's cruiser, about a half step toward the house, when, according to Townsend:

> I hear[d] commotion coming out of the house, you guys killed Tashon or Trayvon or something to that effect.
>
> I look up, and the last thing I saw was a muzzle blast probably about like this, about eye level, pointed directly at me and Officer Tobin. I am 150 percent sure that it was pointed at me as the blast went off.

I mean, you could see basically a silhouette of a gun pointed directly down. Again, it was eye level for me, and I saw basically a silhouette of a person holding the gun pointed down in a downward angle at us. (Tr. Vol. II, 202; 200–01.)

. . . Townsend testified that he believed the person on the porch, who he identified in court as [Petitioner], fired a shot at both him and Tobin, elaborating that, right before the shot, [Petitioner] said "I will kill you, and ma[de] reference to Tashon and Travon [sic]" and "when [Townsend] saw the downward angle, this gun pointed in the direction of us, that barrel was staring me right basically between my eyes." (Tr. Vol. II, 203.) Townsend jumped behind Tobin's cruiser to gain cover, called for help, and drew his weapon.

. . . On cross-examination, Townsend agreed that it was dark the morning of the incident, but testified that "[t]he gun was pointed right at me." (Tr. Vol. II, 220.) Townsend confirmed that he never saw anything thrown out of the house, and that he was able to observe the porch the entire time.

. . . Detective Thomas Burton testified to being dispatched to 872 Lockbourne Road as a crime scene detective with the Columbus police department, and recording a list of photographs taken at the scene and property collected from the property. Among photographs taken of the scene outside the home, Burton described a kitchen knife found on the sidewalk near the cruisers, "fresh damage" to the hill across the street possibly due to a bullet strike, the firearm recovered from the scene both in the trunk of police cruiser 112 and posed at the crime scene lab, a live 7.62–caliber round located in the front right passenger seat of police cruiser 112, and a spent 7.62–caliber shell casing in the grass just to the north of the walkway of 872 Lockbourne Road. (Tr. Vol. II, 246.) Photographs taken of the inside of the home included boxes of ammunition and an empty plastic magazine for an assault rifle located in a "middle" room, and a spent 7.62–caliber shell casing near the rear door of the home. (Tr. Vol. II, 253.) On the kitchen table, photographs document live 7.62–caliber ammunition, an empty automatic assault rifle magazine, and a long kitchen knife "comparable to the kitchen knife" found on the sidewalk. (Tr. Vol. II, 257.) Photographs of the upstairs show a 3.08–caliber assault rifle with a loaded magazine next to it located underneath a bedroom mattress. Burton additionally identified and described physical property taken from the residence, including the kitchen knife from the sidewalk, live ammunition and magazines taken from inside the home, spent shell casings, and the two rifles.

. . . Burton testified that crime scene detectives were unable to locate anything from the hole in the hill across the street, and that the 7.62–caliber assault rifle did not have a magazine with it when he recovered it from the trunk of cruiser 112. On cross-examination, Burton agreed that someone else put the rifle in the trunk of the cruiser, and he did not know how the live bullet in the front seat of that cruiser got there. Burton further confirmed that the empty 7.62 magazine found on the kitchen

table would probably fit the assault rifle placed by police in the back of cruiser 112, but he did not verify if that magazine actually fit the rifle.

. . . On redirect and recross-examination, Burton described the common process police take to "clear" a gun to make it safe, which includes removing the magazine, checking to see if a live round remains in the chamber, and, if so, pulling the ejection bar back causing the live round to fall out of the gun. (Tr. Vol. II, 276.) Burton testified that because one live bullet could still be in the chamber of a gun even when the magazine has been removed, that gun is still capable of discharging. Burton additionally testified that, although they put in effort to determine whether a bullet existed in the potential bullet strike hole, they were unable to determine for sure that no bullet remained deeper within the hill.

. . . Kelby Ducat, a forensic scientist with the Columbus police department, testified that his tests showed that the two spent shell casings recovered from the scene had been fired from the 7.62–caliber rifle, which he determined to be operable. He confirmed that the 7.62–caliber rifle had no safety mechanism to prevent it from firing without a magazine, and therefore it was capable of firing without a magazine by individually loading bullets between shots. Such a rifle with the magazine in would automatically reload a bullet after being fired. Ducat testified that the 7.62–caliber rifle required an "average" trigger pull, measuring 4.75 pounds of force applied to the trigger in order to fire, as opposed to a hairline or heavy trigger pull. (Tr. Vol. II, 305.) Ducat agreed the empty magazine found on the table looked like the design of a magazine that would go into the 7.62–caliber rifle, and additionally found the 3.08 rifle recovered from the upstairs bedroom to be inoperable.

. . . The state moved to admit photographs of the crime scene and property taken as evidence. [Petitioner] objected to admission of reference in exhibit B, the property logs, to the inoperable rifle and ammunition of calibers other than associated with the 7.62 rifle. The court sustained the objection, finding "any references to other ammunition or weapons that are inoperable [to be] both more prejudicial than probative," and those references to be irrelevant and also cumulative. (Tr. Vol. II, 328.) Therefore, the court admitted "Exhibit B to the extent that any references to ammunition and weapons not related to the underlying charges are redacted." (Tr. Vol. II, 328.) State's exhibit C, the firearms lab of Ducat, was similarly admitted with redactions related to the inoperable rifle and non–7.62–caliber ammunition, and photographs depicting those same items were later removed as exhibits. [Petitioner] likewise objected to the admission of the actual non–7.62–caliber ammunition and the inoperable firearm, and the trial court again sustained the objection, finding "its probative value is substantially outweighed * * * by the danger of unfair prejudice or confusion of the issues or of misleading the jury." (Tr. Vol. II, 332.)

. . . Appellee rested its case-in-chief. [Petitioner] moved for a judgment of acquittal under Crim.R. 29(A), asserting appellee had failed to prove the element of

"knowingly," which the court overruled. (Tr. Vol. II, 335.) [Petitioner] and his fiancée then testified in his defense.

. . . Seniqua Venavle testified that she lived with [Petitioner], her fiancé and the father of her two children, at 872 Lockbourne Road in January 2014. According to Venavle, [Petitioner] left the house on the evening of January 5, 2014 and returned at approximately 1:00 or 2:00 a.m., at which time she stated she was asleep upstairs with the children. When [Petitioner] returned, Venavle went downstairs, and thought "[h]e was panicking like he really thought somebody was coming to get him," "paranoid," and speaking about things that did not make sense. (Tr. Vol. III, 346–47.) She went upstairs to check on the children, heard a gunshot out the back door, and returned to find him in the kitchen. According to Venavle, for around ten minutes, [Petitioner] paced back and forth from the kitchen to the dining room with the gun, then took the bullets out of the magazine and placed the magazine and bullets on the kitchen table. [Petitioner] continued to pace with the gun for a few hours, and she tried to calm him down while also checking on the children upstairs a couple of times. She did not see him load the gun with additional bullets. [Petitioner] had broken their cell phones, so she could not call the police.

. . . Venavle testified that, around dawn, [Petitioner] went to the front door and began yelling "[y]ou are not going to come get me, you are not going to come get me," and then she heard, but did not see, [Petitioner's] gun go off. (Tr. Vol. III, 356.) According to Venavle, [Petitioner] dropped the gun on the porch and ran inside, tried to take cover, and told her he thought "they" were shooting him. (Tr. Vol. III, 357.) She did not know who he was referring to, and had not personally viewed anyone outside the home from her position in the middle room of the house. [Petitioner] then went back to the front door and gave himself up to police.

. . . [Petitioner] testified that the gun fired by accident. According to [Petitioner], on January 5, 2014 at around 10:00 p.m. he met up with a friend named Ikey, spent time at his house discussing personal problems,[1] drove around together in [Petitioner's] car, and eventually returned home around 1:00 or 2:00 a.m. Around 5:00 or 5:30 a.m., [Petitioner] got his rifle, which he kept in his kitchen closet to protect his family, put a loaded magazine into the gun, and fired out the back door of his house–only his second time shooting that gun. When Venavle came downstairs, he took the magazine out of the gun and emptied the bullets because he did not want to hurt anybody. [Petitioner] paced and shouted about somebody killing his brother, and that they were coming to kill him. [Petitioner] got his rifle, opened his front door to make sure everything was okay, and noticed the police cruiser parked in front of the house through the trees in his yard. According to [Petitioner], seeing the police made him "tense[ ] up," and the "gun went off." (Tr. Vol. III, 412.) When asked "[d]id you think they were going to do something to you," [Petitioner] replied, "[t]he officers? * * * Maybe if I still had a gun in my hand, yeah." (Tr. Vol. III, 413.) [Petitioner] then testified that he dropped the gun and "walked back in the house." (Tr. Vol. III, 414.)

. . . [Petitioner] testified that, the gun did not have the magazine in it when he dropped it, he never put a bullet in the gun and did not know how to load a bullet in the gun, he did not know the gun was loaded, and had not previously thrown a knife at the police cruiser. [Petitioner] further testified that he only saw the police cruiser and not the officers, never pointed the gun or tried to shoot the officers, and only held the gun to scare people off. [Petitioner] stated he had no criminal record and had never been arrested prior to this incident.

. . . On cross-examination, [Petitioner] had no explanation for how a large kitchen knife, which he admitted to be from his kitchen, ended up by the police cruisers, and denied yelling at the officers either before the gun fired or when the SWAT team arrived. [Petitioner] testified that, at the time of the incident, he understood that a bullet remains in the chamber of the rifle when the magazine is removed, and specified "I thought I cleared the gun. I never said I did not know that there was a bullet in the gun." (Tr. Vol. III, 441.) [Petitioner] agreed that no one else was outside at the time of the incident. Explaining how the gun went off, [Petitioner] testified, "I told you, I tensed up when I seen the officers, when I seen the cruiser, I tensed up, and the gun went off. I never pointed the gun at nobody." (Tr. Vol. III, 443.)

. . . After [Petitioner's] testimony, both parties rested. The jury found [Petitioner] guilty of both counts of felonious assault, pursuant to R.C. 2903.11, as well as the firearm specifications under both counts. A sentencing hearing was held on May 6, 2015 after which the judge imposed for Count I, a sentence of 4 years incarceration with an additional 7 years for the firearm specification, and, for Count II, a sentence of 4 years incarceration with an additional 7 years for the firearm specification. The judge ran the sentences for two felonious assault counts concurrently to each other and consecutively to the firearm specifications, for a total of 18 years incarceration. [Petitioner] filed a timely appeal.

. . . **ASSIGNMENTS OF ERROR**
[Petitioner] submits four assignments of error for our review:

[I.] The trial court erred in denying [Petitioner's] Crim.R. 29 motion for acquittal, and violated his rights to due process and a fair trial when, in the absence of sufficient evidence, it convicted him of the second count of felonious assault and accompanying 7–year firearm specification. Fifth and Fourteenth Amendments, United States Constitution; Sections 10 and 16, Article I, Ohio Constitution. R.C. 2903.11(A)(2); R.C. 2941.1412.

[II.] The trial court erred when it did not merge [Petitioner's] second felonious-assault and firearm-specification convictions. R.C. 2941.25. Fifth and Fourteenth Amendments, United States Constitution; Section 10, Article I, Ohio Constitution.

[III.] [Petitioner] was deprived of his constitutional right to equal protection. Fourteenth Amendment, United States Constitution; Section 2, Article I, Ohio Constitution.

[IV.] [Petitioner] was deprived of his constitutional right to the effective assistance of counsel. Fifth, Sixth, and Fourteenth Amendments, United States Constitution; Sections 10 and 16, Article I, Ohio Constitution.

*State v. Massalay*, No. 15AP-544, 2016 WL 807653, at *1–*8 (Ohio Ct. App. March 1, 2016).

## II.  STANDARD OF REVIEW

Because Petitioner seeks habeas relief under 28 U.S.C. § 2254, the Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this case.  The United States Supreme Court has described AEDPA as "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and emphasized that courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy."  *Burt v. Titlow*, 571 U.S. 12, 20 (2013) (quoting *Harrington v. Richter,* 562 U.S. 86, 102 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA . . . imposes a highly deferential standard for evaluating state–court rulings, and demands that state–court decisions be given the benefit of the doubt.") (internal quotation marks, citations, and footnote omitted).

AEDPA limits the federal courts' authority to issue writs of habeas corpus and forbids a federal court from granting habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state-court decision either:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The United States Court of Appeals for the Sixth Circuit has explained the meaning of the standards found in § 2254(d)(1) as follows:

> A state court's decision is "contrary to" Supreme Court precedent if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[,]" or (2) "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives" at a different result. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an "unreasonable application" under 28 U.S.C. § 2254(d)(1) if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id.* at 407, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389.

*Coley v. Bagley*, 706 F.3d 741, 748–49 (6th Cir. 2013).

Under § 2254(d)(2), a state court's factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion. *Wood v. Allen*, 558 U.S. 290, 301 (2010). Instead, "[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding[.]" *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010) (quoting *Miller–El v. Cockrell,* 537 U.S. 322, 340 (2003) ("*Miller–El I*"). A state court's factual findings are therefore "only unreasonable where they are 'rebutted by clear and convincing evidence' and do not have support in the record." *Moritz v. Woods*, No. 16-1504, 2017 WL 2241814, at *5 (6th Cir. May 22, 2017) (*quoting Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017)) (internal quotation marks omitted).

The burden of satisfying AEDPA's standards rests with the petitioner. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## III.    LAW AND ANALYSIS

### A.    Sufficiency of the Evidence

Petitioner asserts that the evidence was constitutionally insufficient to sustain his two convictions for felonious assault in violation of Ohio Revised Code § 2903.11.   Specifically, Petitioner alleges that the evidence did not establish that he knowingly intended to harm both officers when he fired a single shot.   Petitioner further contends that it was factually impossible for both officers to be struck by the single bullet that he fired because, although both officers had begun walking towards him, one officer had cleared the bumper of the car while the other was still at the bumper.   (Doc. 8, at PAGEID #: 869.)   Respondent argues that this claim is without merit.

The state appellate court rejected Petitioner's claim:

> In order to find [Petitioner] guilty of felonious assault, for each count appellee had to prove beyond a reasonable doubt that appellant "knowingly * * * attempt[ed] to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."   R.C. 2903.11(A)(2).   "Physical harm" means "any injury, illness, or other, physiological impairment, regardless of its gravity or duration."   R.C. 2901.01(A)(3).
>
> . . . Furthermore, "[a] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature."   "A person has knowledge of circumstances when the person is aware that such circumstances probably exist."   R.C. 2901.22(B).   A person acts "knowingly" to support multiple counts of felonious assault under R.C. 2903.11 where testimony establishes that the person fired one shot at multiple victims. *State v. Neal,* 2d Dist. No. 82 CA 82 (Jan. 20, 1984) (holding sufficient evidence supported two counts of felonious assault where victims testified defendant "aimed it (gun) at us" and defendant "took the shot at us"); *State v. Mills,* 62 Ohio St.3d 357 (1992) (evaluating sufficiency of evidence to support defendant's convictions for felonious assault for multiple victims by proximity to shot and whether victims where "in the line of fire" of the shot). *See also State v. Gowdy,* 6th Dist. No. E–06–071, 2009–Ohio–385, ¶ 23–25 (holding that evidence was sufficient to support defendant's convictions for felonious assault for two victims where defendant fired one bullet into victims' home).
>
> [Petitioner] argues that the officers' testimony demonstrates that it is factually impossible for both officers to have been struck by the one bullet fired, and therefore [Petitioner] "could not have been 'aware that his conduct [would have]

probably cause[d] a certain result,' relative to the second victim." (Appellant's Brief, 8.) As such, appellant argues appellee presented insufficient evidence on the "knowingly" element of the second conviction.

. . . In support of his argument, appellant cites to *State v. Nolan,* 141 Ohio St.3d 454, 2014–Ohio–4800, ¶ 10. In *Nolan,* the Supreme Court of Ohio determined it was impossible to commit "attempted felony murder." *Id.* In doing so, the court specified, "an attempt crime must be committed purposely or knowingly and intent to kill need not be proven for the state to obtain a conviction for felony murder, so that a person can be convicted of that offense even though the death was unintended." *Id.*

. . . It is apparent that *Nolan* dealt with the impossibility of purposely or knowingly committing a strict liability offense, which does not require intent. Therefore, *Nolan* is not controlling on our issue of whether appellee proved the requisite mens rea of "knowingly" required for the underlying offense of felonious assault based on the facts at hand.

. . . Moreover, the record here supports appellant's conviction for each separate conviction. Tobin testified that appellant was yelling obscenities, that he believed appellant threw a large kitchen knife at him, and answered "yes" when asked "are you certain that [Petitioner] fired at you?" (Tr. Vol. II, 147.) Townsend testified that he heard [Petitioner] yelling "I will kill you," that he believed appellant aimed the threats at the officers, and testified that the rifle was pointed directly at both him and Tobin. (Tr. Vol. II, 201.) Moreover, we do not find that the record shows, as appellant suggests, that it was factually impossible for both officers to be physically harmed by one shot. The officers' testimony established that the semiautomatic rifle is a powerful weapon, and that the officers were in very close proximity to each other when the shot was fired, in such position to appellant that each officer believed the rifle to be aimed at him. In addition, under *Neal* and *Mills*, this testimony establishes that both officers were in the line of fire and at risk of injury by appellant's single shot. Therefore, if believed, the evidence presented by appellee supports appellant's second conviction for felonious assault and the associated gun specifications.

. . . Accordingly, appellant's first assignment of error is overruled.

*Massalay*, 2016 WL 807653, at **9–10.

The Fourteenth Amendment's Due Process clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). The question in a sufficiency of the evidence claim is "whether, after viewing the evidence in the light most favorable to the

prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). The *Jackson* standard must be applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Brown v. Palmer*, 441 F.3d 347, 351 (6th Cir. 2006) (quoting *Jackson*, 443 U.S. at 324 n.16). When determining if the evidence was sufficient to support a petitioner's conviction, a federal habeas court must view the evidence in the light most favorable to the prosecution. *Wright v. West*, 505 U.S. 277, 296 (1992) (citing *Jackson*, 443 U.S. at 319). The prosecution is not affirmatively required to "rule out every hypothesis except that of guilt." *Id.* (quoting *Jackson*, 443 U.S. at 326). Instead, "a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Id.* at 296–97 (quoting *Jackson*, 443 U.S. at 326).

Moreover, federal habeas courts must afford a "double layer" of deference to state court determinations of the sufficiency of the evidence. As explained in *Brown v. Konteh*, deference must be given, first, to the jury's finding of guilt because the standard, announced in *Jackson*, is whether "viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 567 F.3d 191, 205 (6th Cir. 2009). Second, even if a *de novo* review of the evidence leads to the conclusion that no rational trier of fact could have so found, a federal habeas court "must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *Id.*; *see also White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009). This is a substantial hurdle, one that Petitioner has failed to surmount.

Indeed, in light of these standards, the state court's decision is not contrary to Supreme Court precedent, an unreasonable application of federal law, or an unreasonable determination of facts. The evidence presented at trial, viewed in the light most favorable to the prosecution, is sufficient to establish that Petitioner acted with the requisite intent. First, the record contains evidence that Officers Tobin and Townsend were close to one another when Petitioner fired the gun. Officer Tobin testified that when the gun was fired, he and Officer Townsend were walking towards Petitioner and that Officer Townsend was either next to him or directly behind him. (Doc. 5–3, at PAGEID #: 482–83.) Officer Townsend's testimony was similar. He testified that he and Officer Tobin were standing side by side talking when they decided to walk towards the house where Petitioner was located, and that he had only taken "maybe a step or a half step" towards the house when "everything happened." (*Id*. at PAGEID #: 515.) Officer Townsend further testified that when the shot was fired, the two Officers "were basically standing next to each other, just basically directly next to each other." (*Id*. at PAGEID #: 499.) There was also evidence that Petitioner aimed the gun at both Officers. Officer Tobin testified that a detective at the scene had asked him "are you certain that [Petitioner] fired at you?" and that he had responded "yes." (*Id*. at PAGEID #: 444.) Officer Tobin also testified that although he could not see where Petitioner was pointing the gun when he fired it, he could tell that Petitioner was looking at him. (*Id*. at PAGEID #: 445.) Officer Townsend testified that he looked up and saw a "muzzle blast" "pointed directly at me and Officer Tobin"; that he saw the silhouette of a person holding a gun pointed in a downward angle at both of them; that the "gun was pointed in the direction of us"; and that he believed that Petitioner was shooting at him and Officer Tobin. (*Id*. at PAGEID #: 497–500.) Such evidence was sufficient to show that the single gunshot put both Officers at risk and, thus, under Ohio law, Petitioner knowingly attempted to harm them both. Because this evidence was

sufficient to establish the knowing element for each count of felonious assault under Ohio law, habeas relief is not warranted on this claim.

## B. Double Jeopardy

Petitioner also claims that the Double Jeopardy Clause protects him from being convicted of two counts of felonious assault when he fired only a single shot. Respondent asserts that this claim is also without merit.

The Double Jeopardy Clause of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The clause protects criminal defendants from successive prosecutions for the same offense after acquittal or conviction, as well as multiple punishments for the same offense. *Brown v. Ohio*, 432 U.S. 161, 165 (1977). The question of whether Petitioner's sentences violate the Double Jeopardy Clause is one of legislative intent. *See Jackson v. Smith*, 745 F.3d 206, 211–12 (6th Cir. 2014). Important here, a state court's determination that the state legislature intended cumulative punishment is binding on federal courts. *See Volpe v. Trim*, 708 F.3d 688, 697 (6th Cir. 2013). Ohio's statute concerning merging allied offenses of similar import, Ohio Revised Code § 2941.25, is dispositive of the federal double jeopardy question. *See Jackson*, 745 F.3d at 210. Consequently, an Ohio court's determination that two offenses are not allied offenses is conclusive as to the question whether the state legislature intended to authorize cumulative punishment. *See id.* at 212–15.

The Ohio appellate court addressed Petitioner's claim as follows:

Ohio law generally prohibits a defendant from being convicted of more than one "allied offense[ ] of similar import." R.C. 2941.25(A). "In determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must evaluate three separate factors–the conduct, the animus, and the import." *State v. Ruff*, 143 Ohio St.3d 114, 2015–Ohio–995, paragraph one of the syllabus. More specifically, "a defendant whose conduct supports multiple offenses

may be convicted of all the offenses if any one of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus." *Id.* at paragraph three of the syllabus. "Two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at paragraph two of the syllabus . . .

As previously resolved in the first assignment of error, the circumstances of this case do not support [Petitioner's] factual impossibility argument. As the evidence presented at trial was sufficient to convict [Petitioner] of felonious assault for the count associated with Tobin as well as the count associated with Townsend, this is a case involving two separate victims. Therefore, under *Ruff*, the conduct constitutes offenses of dissimilar import within the meaning of R.C. 2941.25(B), and the convictions do not merge.

*Massalay*, 2016 WL 807653, at **10–11.

The state appellate court reasonably concluded that the two felonious assault offenses did not constitute allied offenses under Ohio Revised Code § 2941.25 because they each involved separate victims, and, therefore, they were not subject to merger. The Ohio appellate court's finding that there were two victims under Ohio law is supported by the record. That finding is not contrary to Supreme Court precedent, an unreasonable application of federal law, or an unreasonable determination of facts. Consequently, habeas relief is not warranted on Petitioner's Double Jeopardy claim.

## C.  *Batson* Challenge

Petitioner asserts that his Equal Protection and Due Process rights were violated when the prosecution used peremptory challenges to excuse two African–American jurors.[1] Respondent contends that this claim lacks merit.

---

[1] Although the prosecution used peremptory challenges to excuse a total of three African–American jurors, Petitioner's claims in the state courts and his grounds in this habeas action are related to only two of those three challenges.

The Equal Protection Clause of the Fourteenth Amendment commands that "no State shall . . . deny to any person within its jurisdiction the equal protection of the law."  U.S. Const. amend. XIV, § 1.  This Clause prohibits a prosecutor from using a peremptory challenge to exclude members of the jury venire because of their race.  *Batson v. Kentucky*, 476 U.S. 79, 89 (1986); *see also Braxton v. Gansheimer*, 561 F.3d 453, 458 (6th Cir. 2009).  In *Batson*, the Supreme Court articulated a three–step process for evaluating allegations that a prosecutor has used peremptory challenges in a manner that violates the Equal Protection Clause.  476 U.S. at 96–98.  First, the court must determine whether the defendant made a *prima facie* showing that the prosecutor exercised a peremptory challenge on the basis of race.  *Id.* at 96–97.  Second, if that showing is made, the burden shifts to the prosecutor to present a race–neutral explanation for striking the juror.  *Id.* at 97–98.  "Although the prosecutor must present a comprehensible reason, '[t]he second step of this process does not demand an explanation that is persuasive, or even plausible'; so long as the reason is not inherently discriminatory, it "suffices."  *Rice v. Collins*, 546 U.S. 333, 338 (2006), quoting *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995).  Third, if a race–neutral explanation is offered, the court must then determine whether the defendant carried the burden to prove purposeful discrimination.  *Batson*, 476 U.S. at 98.

"[T]he critical question in determining whether a prisoner has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike."  *Russell v. Bunting*, 722 F. App'x. 539, 547 (6th Cir. 2018) (quoting *Miller-El I*, 537 U.S. at 338–39).  "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise–similar nonblack [panelist] who is permitted to serve, that is evidence tending to prove discrimination."  *Foster v. Chapman,* — U.S. —, 136 S.Ct. 1737, 1754 (2018) (quoting *Miller-El II*, 545 U.S. at 241).  Nevertheless, a court "can only grant [a petitioner's]

petition if it was unreasonable to credit the prosecutor's race–neutral explanations for the *Batson* challenge." *Russell*, 722 F. App'x at 547 (quoting *Rice*, 546 U.S. at 338). As the challenging party, Petitioner "bears the ultimate burden of persuasion" and "must show that the explanation is merely a pretext for a racial motivation." *Id.* (citing *Braxton*, 561 F.3d at 459).

The Ohio appellate court described the relevant events during the jury selection process:

. . . The venire for the trial, consisting of a total panel of 24 prospective jurors, included 18 Caucasian members, 4 African–American members, and 2 members of unidentified racial origin. During *voir dire*, plaintiff-appellee, State of Ohio, used its first peremptory challenge to excuse a Caucasian prospective juror, and used its second peremptory challenge to excuse an African–American prospective juror. [Petitioner] objected, believing that juror to be the sole African–American on the panel, but then withdrew his objection when the presence of another African–American on the panel was noted by appellee.

. . . [Petitioner] renewed his objection when appellee used its third and fourth peremptory challenges to excuse two more African–American prospective jurors. As the race-neutral basis for its third peremptory challenge, appellee pointed to the juror's employment as a social worker who "works directly for and with the people against whom the government intervenes." (Tr. Vol. I, 100.) The trial court, reviewing the *Batson v. Kentucky,* 476 U.S. 79 (1986) decision, overruled [Petitioner's] objection to appellee's third peremptory challenge, stating:

> I understand that [under *Batson*] the state has to provide a race-neutral reason. I do have a concern that we are eliminating African–American jurors. I am sensitive to the fact [that one juror] remains as an African–American member of this panel.

> Batson requires the defendant to show that there has been purposeful discrimination in the exclusion of these jurors. The court will find at this point there has been no purposeful discrimination. The prosecutor has provided the race-neutral reason for the exclusion of these jurors. I am going to permit the challenge [and the juror] will be removed from the panel. (Tr. Vol. I, 101.)

. . . As the race-neutral basis for its fourth peremptory challenge, appellee pointed to the juror's admission that, in order to help people, she behaves in a way that she knows to be inappropriate in her position as a dispatcher for the police, and appellee expressed concern that that juror could go outside the rules to pursue her own agenda as a juror in the case. In response, [Petitioner's] counsel noted that his client was African–American and that appellee had attempted to eliminate three out of

four, or 75 percent of the African–American pool in the venire. The court, in again overruling [Petitioner's] objection, stated:

> I am slightly concerned about the pattern that has developed. I appreciate the fact [appellee] indicated to the court that you struck [a Caucasian juror] with your first peremptory challenge. We have eliminated a number of African–Americans, African–American descendants.
>
> I am sensitive to the fact that [Petitioner] is entitled to a jury of his peers. I think that would include African–American jurors, and you have provided the court with race-neutral reasons, but I am challenged by the reasons, the reasons that you have provided to this court for eliminating these prospective jurors, and I think that we are treading a dangerous line with the challenges.
> * * *
> This is about my ensuring that [Petitioner's] constitutional rights are protected. I am not attempting to impugn your integrity, but the *Batson* case exists for a reason, and I have to be sensitive to the reason that it exists * * * we have now had three challenges of the four African–Americans who are called as prospective jurors on this panel. * * * I heard [the last challenged juror's] response, that she thinks that others may consider what she does a misuse of her authority or power, but that she thinks that there are several ways to achieve a certain end.
> * * *
> If the court follows the letter of the law as outlined in *Batson,* the only requirement or the reason that this case was remanded to the trial court is because the prosecutor did not provide a race–neutral basis for his challenge of African–American jurors. That is why the case was remanded to the trial court.
>
> The record has reflected that [appellee] has provided that race–neutral reason, and so the court will allow the challenge. I will just be candid, I am concerned by the challenges that I have seen, but based on the law by which this court is bound, it has little basis to challenge the race–neutral reason that was provided. (Tr. Vol. I, 103–06.)

*Massalay*, 2016 WL 807653, at *1–*2.

Petitioner asserts that with regard to the prosecution's use of its third and fourth peremptory challenges, the state trial court erred at *Batson's* third step by simply accepting the prosecution's race–neutral reasons for the challenges and failing to determine "whether the stated reasons for the

challenges were the *actual reasons* for the strikes in light of all the circumstances." (Doc. 8, at PAGEID #: 877.) (emphasis in original) Petitioner asserts that the trial court failed to consider how the third step of *Batson* was impacted by the Supreme Court's decisions in *Miller–El I*, and *Miller–El v. Dretke*, 545 U.S. 231, 240 (2005) ("*Miller-El II*") and suggests that this resulted in a decision that was contrary to or an unreasonable application of federal law.

The state appellate court correctly concluded, however, that *Miller–El I* and *Miller–El II* did not create a new standard at step three of *Batson*. *Massalay*, 2016 WL 807653, at *12. In *Miller-El I*, the Supreme Court reiterated that the critical question when determining if an opponent of a strike has established purposeful discrimination is the persuasiveness of a prosecutor's explanations for a strike. 537 U.S. at 338–39. In *Miller-El II*, the Supreme Court discussed a variety of factors that undermined the persuasiveness of the prosecution's race-neutral explanations: (1) the statistical significance of the prosecution's peremptory strikes, which excluded 91% of eligible African–Americans; (2) comparisons that revealed that the prosecution's explanations for excluding black jurors applied equally to white jurors who were not excluded; (3) the disparity in graphic questions about the death penalty posed to black jurors versus questions about the same topic posed to white jurors in "bland" fashion; (4) suspicious use of the state's "jury shuffle system," which allowed either party in a criminal proceeding to rearrange the order in which a venire panel was seated and questioned; and (5) the district attorney's office's history of discrimination in jury selection. 545 U.S. at 240–64. In both of those cases, however, the standard at step three remained the same— the court was required to determine whether defendant proved purposeful discrimination and that the prosecution's race-neutral explanations were pretextual.

The state appellate court further concluded that the trial court knew that it was required to determine if Petitioner had proven purposeful discrimination at step three and that the trial court did not simply accept the prosecutor's race-neutral explanations for the prosecution's third and fourth peremptory challenges. The state appellate court explained:

> Here, the trial court was aware that it must ultimately decide whether [Petitioner] "show[ed] that there has been purposeful discrimination in the exclusion of these jurors." (Tr. Vol. I, 101.) By expressing that "based on the law by which this court is bound, it has little basis to challenge the race–neutral reason that was provided," the trial court indicated that it knew that appellee's race–neutral reason was not synonymous with a lack of purposeful discrimination, while also expressing the difficulty in challenging that race–neutral reason under the law, at least on the facts and arguments of this case. (Tr. Vol. I, 106.)
>
> . . . The trial court's solicitation of arguments from both attorneys regarding the excluded jurors at issue, and its express consideration of a range of circumstances in support of and against the strikes, further supports our finding that the trial court did not simply accept the race–neutral reasons presented by appellee. For example, regarding its third peremptory strike, appellee stated a concern that the juror was a social worker working on behalf of those people against which the "government intervenes." (Tr. Vol. I, 100.) In response, [Petitioner] argued that the social worker was the second African–American excused. After those arguments, the trial court expressed concern over the elimination of African–American jurors, expressly considered that another African–American remained on the panel, and concluded that no purposeful discrimination had occurred at that point and that appellee's reason was race–neutral. Regarding its fourth peremptory strike, appellee stated a concern that the juror admitted she went outside of rules to help people. [Petitioner] countered, again, with the number of African–Americans excluded. After expressly considering circumstances such as her personal recollection of that juror's response during voir dire, appellee's use of its first strike on a Caucasian woman, and a pattern where appellee used three out of four strikes against African–Americans, the trial court allowed appellee's challenge and excused that juror. Based on a careful reading of the record, we find the trial court's analysis of the contested peremptory strikes to be sufficient to preserve a constitutionally permissible jury selection process . . .
>
> . . . The record likewise does not support [Petitioner's] arguments aimed at undermining the trial court's ultimate determination to reject [Petitioner's] *Batson* challenges. First, while statistics of peremptory challenges used to strike African–American venire members is evidence of purposeful discrimination, it is not conclusive. *See generally Miller–El II* (analyzing bare statistics as well as factors such as similarity of voir dire answers, juror shuffling, disparate questioning, and the history of the prosecutor's office's discrimination).

Further, appellee's reason for striking an African–American juror because she was a social worker who repeatedly works directly with people against whom the government intervenes does not "appl[y] just as well," as [Petitioner] suggests, to a Caucasian panelist who had once been a crime victim when the perpetrator was never found by police, and therefore does not tend to prove purposeful discrimination. *Miller–El II* at 241. Finally, appellee's statement that it used a peremptory challenge to exclude a Caucasian venire member and did not challenge an additional African–American member of the jury may be taken into account as part of the circumstances tending to disprove purposeful discrimination. *State v. White,* 85 Ohio St.3d 433, 438 (1999), *rev'd on other grounds.* Therefore, based on the record, we do not find the trial court's rejection of [Petitioner's] *Batson* challenges to rise to the level of clear error.

*Massalay*, 2016 WL 807653, at *12–*13.

The record supports the state appellate court's determination that the trial court used the correct legal standard at step three of *Batson*. The trial court judge correctly stated on the record that "*Batson* requires the defendant to show that there has been purposeful discrimination." (Doc. 5–2, at PAGEID #: 398.) As also detailed by the state appellate court, the trial court indicated that it had little basis to reject the prosecution's race-neutral explanations—that constituted an acknowledgement that the trial court lacked reasons to reject those explanations, not that it was mandated to accept them.

The record also reasonably supports the appellate court's determination that Petitioner did not prove purposeful discrimination or that the prosecution's race-neutral explanations were pretextual. The prosecution's peremptory challenges eliminated three potential African–American jurors. But one African–American juror remained. The prosecution also used one of its peremptory challenges to exclude a white juror. The state appellate court explained that the state trial court had properly noted these circumstances when analyzing whether Petitioner had proven purposeful discrimination at step three. *United States v. Kimbrel*, 532 F.3d 461, 466 (6th Cir. 2008) (explaining that to determine whether an opponent of a strike has proven purposeful discrimination, "the court must assess the [proponent's] credibility under all of the pertinent

circumstances, and then . . . weigh the asserted justification against the strength of the [opponent's] prima facie case under the totality of the circumstances.") (quoting *Paschal v. Flagstar Bank*, 295 F.3d 565, 574 (6th Cir. 2002)).

The state appellate court also reasonably concluded that the race-neutral explanation for the prosecution's third challenge did not apply to a non-black juror who was not excluded and therefore did not demonstrate that the explanation was pretext.  Specifically, the prosecution used its third peremptory challenge to strike an African–American social worker because she may have harbored an anti–government bias due to her work on behalf of parents whose children are removed by the state.  (Doc. 5–2, at PAGEID #: 397.)  The state appellate court reasonably concluded that the same risk of anti–government bias did not apply to a white crime victim whose perpetrator was never caught.  This was not an unreasonable determination of the facts—although the social worker might arguably have been sensitive to perceived government overreach, the crime victim might arguably have been sensitive to perceived government underreach.  Petitioner also made no attempt to suggest that the prosecution's reason for using its fourth peremptory challenge to strike an African–American police dispatcher—that she might "go outside the rules" "to pursue her own agenda" because she acknowledged that she "might misuse her position" to help others when working as a dispatcher—applied to any other non-black jurors.  (*Id.* at PAGEID #: 397, 345.)  Accordingly, it was not unreasonable for the trial court to credit the prosecution's race-neutral explanations for its third and fourth peremptory challenges.

In sum, the state appellate court's determinations are not contrary to Supreme Court precedent, an unreasonable application of federal law, or an unreasonable determination of facts. Habeas relief is not warranted on Petitioner's *Batson* claim.

### D.     Ineffective Assistance of Trial Counsel

Petitioner maintains that he was denied the effective assistance of trial counsel because his attorney failed to object to testimony about additional ammunition that was found in his home and references to guns and ammunition being present with his children.  (Doc. 8, at PAGEID #: 885.) The state appellate court rejected these claims:

> . . . "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial [court] cannot be relied on as having produced a just result." *Strickland v. Washington,* 466 U.S. 668, 686 (1984). "To establish a claim of ineffective assistance of counsel, a defendant must show that the performance of trial counsel was deficient and that the deficient performance prejudiced him." *State v. Frye,* 10th Dist. No. 14AP–988, 2015–Ohio–3012, ¶ 11, citing *Strickland* at 687. To demonstrate that counsel's performance was deficient, the defendant must show that counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment. *State v. Canada,* 10th Dist. No. 14AP–523, 2015–Ohio–2167, ¶ 89. In doing so, the defendant must overcome the strong presumption that counsel's performance was adequate or that counsel's actions might be considered sound trial strategy. *Id.* at ¶ 90. "The 'failure to make objections does not constitute ineffective assistance of counsel *per se,* as that failure may be justified as a tactical decision.'" (Emphasis sic.) *State v. Loughman,* 10th Dist. No. 10AP–636, 2011–Ohio–1893, ¶ 63, quoting *State v. Gumm,* 73 Ohio St.3d 413, 428 (1995). To demonstrate that the deficient performance prejudiced him, the defendant must prove that there exists a reasonable probability that, but for counsel's errors, the result of the trial would have been different. *Id.* "The failure to make either showing defeats a claim of ineffective assistance of counsel." *Frye* at ¶ 11, citing *Strickland* at 697.
>
> . . . [Petitioner] first takes issue with his trial counsel's failure to object to testimony regarding an additional gun and ammunition found in [Petitioner's] home, which [Petitioner] says has no relevance to the charged offenses and is more prejudicial than probative. Trial counsel later objected to, and the trial court excluded the admission of and various references to such evidence in exhibits by determining it was, alternatively, irrelevant, prejudicial, and cumulative. [Petitioner] particularity takes issue with appellee's discussion of the other guns and ammunition in conjunction with the presence of children in the home "as some kind of character defect that suggested guilt."
>
> . . . Nonetheless, trial counsel's initial failure to object to the testimony regarding the other guns and ammunition may have been a tactical decision on his part. Regardless, even if counsel's decision not to object to testimony regarding the other guns and ammunition was in error, [Petitioner] has not shown that such objection

would have resulted in a different outcome in his trial. Toward the pertinent issue at trial, appellee offered the testimony regarding the other guns and ammunition to rebut the defense's accident theory by showing knowledge of guns and rifles. However, this evidence was not appellee's only, or even strongest, evidence on that point. Even without the testimony of the other guns and ammunition, appellee still could rely on the officers' testimony regarding [Petitioner's] directed insults and threats leading up to the rifle firing, seeing [Petitioner] point the rifle in their direction, and Tobin's belief that [Petitioner] threw a large knife at him. In addition, [Petitioner's] testimony attempting to dispute the "knowingly" element of felonious assault at times conflicted with the physical evidence and lacked credibly. For example, [Petitioner] admitted the knife was from his kitchen, but claimed he had no knowledge of how it got there. [Petitioner] admitted he knew how to operate the gun, and oscillated from accidently firing the gun—just tensing up—to admitting firing the gun but not knowing a bullet remained in the chamber. Therefore, [Petitioner] has not proved that his trial counsel's failure to object to testimony regarding an additional gun and ammunition found in [Petitioner's] home had a reasonable probability of producing a different outcome in his trial.

. . . Regarding [Petitioner's] contention that his trial counsel's failure to object to appellee's references to other guns and ammunition in the presence of [Petitioner's] children in the home, we find no error. Appellee's cited reference to the guns in the home with the children was in response to [Petitioner's] contention that he kept the rifle in the home to protect his family, but was, perhaps, not familiar with how to operate that rifle safely. Beforehand, Venavle volunteered and discussed the presence of children in the home repeatedly. Furthermore, the prejudicial effect of appellee's reference to children in the home with the presence of other guns and ammunition would likely be minimal, considering the jury would nonetheless be aware of the childrens' presence around the rifle and ammunition at issue in the case, and [Petitioner] otherwise fails to explain how an objection would change the result of the trial.

*Massalay*, 2016 WL 807653, at **14–15.

"In all criminal prosecutions," the Sixth Amendment affords "the accused . . . the right . . . to Assistance of Counsel for his defence." U.S. Const. amend. VI. "Only a right to 'effective assistance of counsel' serves the guarantee." *Couch v. Booker*, 632 F.3d 241, 245 (6th Cir. 2011) (citation omitted). The two-part test announced in *Strickland* requires a petitioner claiming ineffective assistance of counsel to demonstrate that his counsel's performance was: 1) deficient, and that, 2) the petitioner suffered prejudice as a result. *Strickland*, 466 U.S. at 687; *Hale v. Davis*, 512 Fed. App'x 516, 520 (6th Cir. 2013). Establishing deficient performance by counsel "requires

a showing that 'that counsel's representation fell below an objective standard of reasonableness.'" *Davis v. Lafler*, 658 F.3d 525, 536 (6th Cir. 2011) (quoting *Strickland*, 466 U.S. at 688). To make such a showing, a petitioner "must overcome the 'strong [ ] presum[ption]' that his counsel 'rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Hale*, 512 F. App'x at 520 (quoting *Strickland*, 466 U.S. at 687). "To avoid the warping effects of hindsight, [courts must] 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Bigelow v. Haviland*, 576 F.3d 284, 287 (6th Cir. 2009) (quoting *Strickland*, 466 U.S. at 689). In cases like this one, involving trial performance, a petitioner must establish prejudice by showing that there is a reasonable probability that, but for his counsel's errors, the result of his trial would have been different. *Strickland*, 466 U.S. at 687. A reasonable probability is one sufficient to undermine the confidence in the outcome of trial. *Id.* at 694.

The United States Supreme Court has cautioned federal habeas courts to "guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)." *Harrington*, 562 U.S. at 105. The Court observed that while "'[s]urmounting *Strickland*'s high bar is never . . . easy.' . . . [e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is even more difficult." *Id.* (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010) and citing *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052). The Court instructed that the standards created under *Strickland* and § 2254(d) are both "'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id.* (citations omitted). Thus, when a federal habeas court reviews a state court's determination regarding an ineffective assistance of counsel claim, "[t]he question is not

whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

Mindful of these admonitions, the Court finds that the state appellate court analyzed Petitioner's allegations about counsel's failure to object to testimony about additional guns and ammunition and reasonably determined that Petitioner could not satisfy *Strickland*'s prejudice prong. Specifically, the state appellate court concluded that it was not reasonably likely that the outcome of trial would have been different if trial counsel had objected to that testimony. The state appellate court noted that the testimony about the additional guns and ammunition was offered to demonstrate that Petitioner was knowledgeable about guns and thus rebut his contention that the gun fired accidentally. But as the state appellate court noted, the prosecution had ample other evidence to rebut Petitioner's accident theory, including testimony from Office Tobin and Townsend that Petitioner was yelling at them immediately prior to the shooting, that Petitioner fired the gun at them, and testimony from an expert indicating that the gun that was fired did not have a hair trigger, but instead had a standard pull requiring 4.75 pounds of pressure. (Doc. 5–3, at PAGEID #: 439, 497–500, 602–03.) Similarly, the state appellate court reasonably determined that Petitioner could not satisfy *Strickland's* prejudice prong with regard to references to the fact that the other guns and ammunition were around his children because that had absolutely no bearing on whether the gun was fired accidentally or knowingly.

Petitioner also maintains that he was denied the effective assistance of trial counsel because his attorney failed to object to the prosecution's misrepresentations about evidence related to whether Petitioner threw a kitchen knife at Officer Tobin's police car. (Doc. 8, at PAGEID #: 886.) The state appellate court noted that the prosecution made a misstatement about that evidence

during closing, but nevertheless, found that trial counsel's failure to object to that misstatement was not prejudicial under *Strickland*:

> [Petitioner] is correct that appellee's statement in closing which indicated that Tobin testified to actually seeing [Petitioner] throwing a knife at the cruiser is a misstatement. Tobin testified that he believed [Petitioner] threw the knife at the cruiser after he saw [Petitioner] on the porch before and after hearing an object hit his cruiser, and later seeing a large knife on the sidewalk off of his cruiser. Nevertheless, [Petitioner] has not proven prejudice from this statement. The jury heard the actual testimony themselves, and were explicitly told by the judge: "You must not consider as evidence any statement of any attorney made during the trial, and so the opening statements and closing arguments of counsel are not evidence in this matter." (Tr. Vol. II, 119–20.) The jury is presumed to follow instructions given by the court. *State v. Morris,* 10th Dist. No. 05AP–1032, 2007–Ohio–2382.

*Massalay*, 2016 WL 807653, at *15.

The Court finds that this was not an unreasonable conclusion. Assuming counsel's failure to object constituted deficient performance and not a strategic decision to refrain from interrupting the prosecution during its closing, the record reflects that the jury heard from Officer Tobin about the knife:

> Q: Officer Tobin, we heard how you arrived there, why you arrived. Once you were already there, you were in your vehicle on Lockbourne Road. What happened next?
>
> A: When I pulled in I heard a lot of screaming coming from the area. . . . I couldn't clearly hear what he was saying– excuse me for the language– get the F away from my house. At that time I called up the other cruiser that was supposed to be there with me and asked him to come back to the scene. Just as I hung up the microphone, I heard something bounce off the front right quarter panel of my cruiser. I didn't know what it was at the time. I didn't know if it was a snowball, a beer can, I didn't know, but obviously, something hostile had happened.

(Doc. 5–3, at PAGEID #: 140–41.)

> Q: And you also mentioned that he threw something at your car. Did you later discover what he threw at your car?
>
> A: Yes. It was a ten-inch kitchen knife.

(*Id*. at PAGEID #: 443.)

Q:      You don't get – you are not trained to obtain evidence yourself.  My understanding is that you place a cone on shell casings, things like that, is that right?

A:      Yes.  Not on the shell casing.  Where the bullet struck the ground, and I believe also where the knife was laying on the sidewalk.

(*Id*. at PAGEID #: 480.)  The jury also heard testimony from a crime scene investigator indicating that a kitchen knife comparable to the knife found on the sidewalk next to the police cruiser was located in Petitioner's house.  (*Id*. at PAGEID #: 554.)  In light of this evidence, and the trial court's limiting instruction, it was reasonable for the state appellate court to find that counsel's failure to object to these misstatements were not prejudicial under *Strickland.*

Petitioner also contends that he was denied the effective assistance of trial counsel because his attorney failed to object to "cumulative, material, misrepresentations of its interpretations of evidence."  (Doc. 8, at PAGEID #: 885–86.)  Specifically, Petitioner complains that his counsel failed to object to the state's use of photographs depicting a bullet on the front seat of the police car and a disturbance in the snow that the state believed the bullet may have landed.  (*Id*.)  The state appellate court rejected this claim because Petitioner failed to demonstrate how those purported cumulative deficiencies were prejudicial under *Strickland*:

> Moreover, as previously discussed, appellant admitted he fired the gun, and ample evidence existed to show appellant's knowledge to support his conviction for felonious assault. Therefore, because appellant has not demonstrated a reasonable probability exists that, but for counsel's failure to object to appellee's alleged "cumulative, material misstatements of the evidence," the result of the trial would have been different, appellant has failed to prove prejudice.

*Massalay*, 2016 WL 807653, at *15.  It was not unreasonable for the state appellate court to find that counsel's failure to object to these items were not prejudicial in light of the other evidence used by the prosecution to demonstrate that Petitioner knowingly attempted to harm both officers.

In sum, the state appellate court concluded that Petitioner could not demonstrate that any of trial counsel's allegedly deficient performances were prejudicial.  That determination was not

contrary to Supreme Court precedent, an unreasonable application of federal law, or an unreasonable determination of facts. Habeas relief is not warranted for any of Petitioner's ineffective assistance claims.

## IV. RECOMMENDED DISPOSITION

For the foregoing reasons, the undersigned **RECOMMENDS** that the Petition be **DENIED** and this action be **DISMISSED**.

### Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. 636(B)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

**IT IS SO ORDERED**.

Date: October 16, 2018                                    /s/ Kimberly A. Jolson
                                                         KIMBERLY A. JOLSON
                                                         UNITED STATES MAGISTRATE JUDGE